Joseph H. Harrington
Acting United States Attorney
Eastern District of Washington
Stephanie Van Marter
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOEL CHAVEZ-DURAN,<br><br>Defendant. | 4:21-CR-06028-RMP-3<br><br>United States'<br>Response to Defendant's Motion to<br>Suppress Evidence |

Plaintiff, United States of America, by and through Joseph H. Harrington,

Acting United States Attorney for the Eastern District of Washington, and Stephanie

Van Marter, Assistant United States Attorney for the Eastern District of Washington,

submits the following Response to Defendant's Motions to Suppress, filed at ECF No.

51, requesting Defendant's Motion be denied.

I.    **INTRODUCTION**

On July 22, 2021, Defendant was charged by complaint with one count of

Possession with Intent to Deliver 40 Grams or More of Fentanyl, in violation 21

U.S.C. § 841(a)(1), (b)(1)(B)(vi).  ECF No. 1.  On August 4, 2021, the grand jury

returned a Superseding Indictment charging the Defendant with being a member of a

Conspiracy to Distribute 50 grams or More of Actual Methamphetamine and 400

grams or more of Fentanyl as well as for the conduct which he was initially arrested

pursuant to the above-mentioned complaint.  *See*, ECF 23.

On August 20, 2021, Defendant filed a Motion to Suppress the evidence seized

at the time of his arrest, namely 2000 Fentanyl laced pills located in his pocket.  ECF

51. The Defendant asserts two bases for the suppression of this evidence; the officers

did not have reasonable suspicion to conduct an exterior pat down of his person for

weapons prior to his voluntary transport and acknowledging there was a consent issue,

asserts his consent to the pat down frisk was not voluntary.

To the contrary, the Defendant was identified driving a vehicle that was the

subject of a federal search warrant and part of a large drug trafficking investigation.

*See,* Attachment A, Discovery Pages 0000004.2-83, 00000010.1-.12. (sealed affidavit

in support of search warrant). The vehicle was lawfully stopped to effectuate that

search warrant.  The Defendant and sole occupant of the vehicle, known to DEA and

suspected to be a part of the same drug trafficking organization, (hereafter DTO) was

advised of the search warrant.  Based upon the totality of the circumstances, the

officers and agents present did in fact have a reasonable and articulated suspicion that

he could be in possession of a weapon(s) to justify the pat down frisk once he was

removed from the vehicle. Even without that lawful basis for the frisk, the Defendant

expressly consented to the pat down search after requesting a courtesy ride from the

United States' Response to Defendant's Motion to Suppress Evidence - 2

agents.  After having found a knife in his pocket and during the continued exterior pat

down, the officer advised he felt what appeared to be a baggie of pills in his shorts

pocket.  The Defendant stated, without a question being asked or further search

conducted, that he had 2,000 pills in his pocket. Only after making this statement, did

the officers conduct a search of his pocket and seize the 2000 fentanyl laced pills.

The United States respectfully submits there is no basis to suppress the

evidence obtained from the Defendant and his motion should be denied.

## II.    FACTS OF THE INSTANT CASE[1]

Beginning in May 2021, the Drug Enforcement Administration (DEA) began to

investigate a Drug Trafficking Organization (DTO) operating in the Tri-Cities area of

Washington State.  ECF No. 1 at ¶ 6, *See also*, Attachment A.  Through this

investigation, the DEA conducted three controlled buys of pound quantities of

methamphetamine and over 1,000 pills laced with Fentanyl.  *Id*.  DEA discovered that

the DTO was utilizing several residences, vehicles, and identified a business they

suspected was a front for the DTO, Affordable Landscaping.  *Id*.  Based on the

information discovered during the investigation, agents obtained several search

warrants to include the location of the business, Affordable Landscaping, located at

---

[1] The United States offers this as a summary only prepared by the assigned AUSA not
the potential witnesses involved.  Although the summary was prepared from the
discovery materials, the United States defers to the proposed exhibits which include
the incident reports, recordings, and upcoming testimony as the best source as to the
factual background. All exhibits have previously been provided in discovery.

United States' Response to Defendant's Motion to Suppress Evidence - 3

3829 Kennewick Ave., Kennewick, WA. [2]  DEA also obtained several search warrants for vehicles that were utilized by the DTO during the investigation, to include a black Ford Edge with Washington license plate BUG3081.  ECF No. 1 at ¶ 6-7.

The federal search warrants were executed on July 16, 2021.  Prior to the execution of the search warrants, a confidential source had been in communication with a member of the DTO, Co-Defendant Mendoza-Ruelas, who advised the CS in recorded communications, that he was to receive a shipment of approximately 30 pounds of methamphetamine and over 45,000 fentanyl laced pills.   The CS, through the DEA, arranged to purchase a large quantity of that methamphetamine and Fentanyl laced pills from Mendoza Ruelas.  The timing of the execution of the search warrants was impacted due to these communications and the discussion of the impending drug shipment.

During the execution of the search warrants at the Affordable Landscaping location, the large drug shipment was not located.  *See*, Attachment B Discovery Pages 0000014.02-95.  However, there were numerous K9 dog alerts to the strong odor of narcotics at various locations through the entire property, to include suitcases and storage bins in the basement area of one of the residences previously identified as being the location where drug shipments were processed. *Id.*  Moreover, over $160,000 in US currency was located hidden inside a wall in a separate house and

---

[2] Affordable landscaping was located on one parcel of land with three separate residences.  The search warrants included all three residences.

United States' Response to Defendant's Motion to Suppress Evidence - 4

multiple AK style rifles, packaging materials, scales and other evidence of distribution were located. *Id.*

In additional to the missing shipment of drugs, DEA also did not locate several suspects in the investigation, nor did they locate the Black Ford Edge to execute the search warrant.  As a result, Task Force Agent (TFA) Pitts and DEA continued with the investigation to include looking for this vehicle.  *See*, Attachment D, Discovery Pages 10000060.01-07.  On July 21, 2021, TFA Pitts believed he observed the vehicle back at the Affordable Landscaping property. *Id. S*ee also ECF No. 1 at ¶ 8. TFA Pitts and other officers traveled to the location to try and confirm it was the same vehicle. *Id* at ¶ 8-11.  At approximately 2:50p.m., Agents observed the vehicle leave in tandem with one of the "Affordable Landscaping" work trucks.  *Id.*at ¶ 12. TFA Pitts and other surveillance team members continued to surveille the vehicle to determine who may be driving it and where it was traveling. Agents observed the vehicle travel to a work site where it was parked along with the Affordable Landscaping Truck. Between 3:00pm and 5:20pm, agents surveilled both the Affordable Landscaping Truck and the Ford Edge until the Ford Edge (identified as Target Vehicle 1) departed the job site at approximately 5:25pm.  *Id.* at ¶ 12-17. At the time it departed, agents were unsure who was driving.

TFA Pitts requested Pasco Police Officer Erickson and Kennewick Police Officer Kris Safranek to conduct a vehicle stop pursuant to the federal search warrant

1   for the vehicle.  ECF No. 1 at ¶ 18, *See also* Attachment C, body camera footage[3].

2   TFA Pitts asked them to initiate the traffic stop and to further identify the driver[4].  The

3   officers conducted the traffic stop and the sole occupant and driver identified himself

4   as Joel Chavez Duran.  He also provided his Washington driver's license.

5

6       During this initial contact with the Defendant, Ofc. Safranek also requested the

7   Defendant's phone number as was also requested by TFA Pitts to assist in identifying

8   the driver and his association to the DTO.  The Defendant provided a phone number.

9   *See*, Attachment D and ECF 1. Ofc. Safrneck observed a phone next to the Defendant

10  in the passenger seat that the Defendant had checked twice during his contact.  Ofc.

11  Safranek asked if the number he gave was for that phone.  *Id.* The Defendant stated

12  "no."  Ofc. Safranek that asked what the number was for the phone next to the

13  Defendant.  The Defendant advised he did not know.  ECF No.1at ¶ 18-19.  Ofc.

14  Safranek advised that he could show him how to locate the number in his phone and

15  the Defendant voluntarily gave the phone to the officer to show him.  The phone was

16  not seized at that time and no other information was taken from the phone. *Id.*

---

[3] At the time of this traffic stop, the Kennewick Police Department had not outfitted its
patrollers with body cameras.  Pasco Police Department however, had.  As a result,
only Ofc Erickson had a recording of part of the traffic stop.  Since he did not contact
the Defendant until after his arrest, there is no audio recording of the initial contact
with the Defendant.

[4] Ofc. Safranek makes reference to a "ruse" to identify the driver in the beginning of
the video.  TFA Pitts will testify he did not request them to utilize a ruse as none was
needed given the presence of the search warrant.  However, TFA Pitts did want them
to identify the driver given the nature of the investigation and that several suspects
were still outstanding.  Further, TFA Pitts advised he would arrive on scene to advise
the Defendant of the search warrant.

As noted in the video, when TFA Pitts and SA Savage arrived on scene and prior to them contacting the Defendant, SA Savage advised the officers they were seizing the car and would just "kick him loose" referring to the Defendant. *See*, Attachment C at 3:34. He further asked the officer, "suppose we could drive him somewhere?" TFA Pitts intended to ask the Defendant if he would engage in an interview with him and stated he would "ask him if he wants to come back" referring to the department for the interview. *See,* Attachment C at 4:06. TFA Pitts was also advised of the identity of the driver. Prior to the traffic stop, TFA Pitts knew there were two "Joel's" identified as members of this DTO. Joel Espinoza was more specifically discussed in the search warrant affidavit as it related to the property at Affordable Landscaping. *See,* Attachment A. However, contrary to the Defendant's assertions, TFA Pitts will testify that he also knew of a second "Joel" related to several members of this same DTO. This was affirmed during the execution of the search warrants at Affordable landscaping, that there was a second "Joel" living at the location. *See*, Discovery pages 10000049.01-49.05. Based upon the scope and status of the investigation at the time, TFA Pitts had an articulated concern for officer safety and that the Defendant could be armed.

As seen on the video, TFA Pitts approached the driver side of the vehicle, identified himself and advised they had a search warrant for the vehicle. *Id*. See also ECF No.1 at ¶ 20 and Attachment D. TFA Pitts further advised they would be seizing the vehicle to effectuate the warrant. *Id*  Defendant was informed that he was not

under arrest.  TFA Pitts inquired if he would be willing to be interviewed regarding

the drug investigation back at the Pasco Police station rather than conduct an

interview on the side of the road.  *Id.*  The Defendant initially agreed and there was

discussion of a voluntary transport back to the Pasco PD.  *See*, Attachment C.  At

approximately 6:40 into the body camera footage, Ofc. Safranek reiterated the

Defendant was not under arrest and they he had agreed to be transported back to Pasco

PD. *Id.*  At approximately 8:20 into the body camera footage, the transporting officer

approached SA Savage and TFA Pitts about the courtesy transport.  SA Savage and

TFA Pitts advised the Defendant no longer wanted to be transported to the Pasco PD

for an interview and so instead they inquired if he could give courtesy transport where

the Defendant asked.  *Id.*   The Defendant was inside his vehicle during the entire

contact to this point.  *Id.*

The Defendant argues that the officer's decision to allow the Defendant to

remain in the vehicle is somehow inconsistent with their reasonable suspicion as to

whether he could be armed. To the contrary, the fact that he was allowed to remain in

the vehicle, not only goes to the voluntary nature of the contact, but from an officer

safety perspective, was a temporary way to control an unknown variable.  Had the

Defendant engaged in any other suspicious or furtive behavior, it would have

impacted that decision.  It was not until the Defendant exited the vehicle that a pat

down search would be necessary.

As TFA Pitts will testify, after going back and forth regarding whether the Defendant was going to come talk to the agents voluntarily, the Defendant told TFA Pitts he wanted to call later to meet. As a result, the issue of what the Defendant wanted to do for transport was addressed. *See,* ECF No.1, Attachments C and D. TFA Pitts will describe that while the Defendant was still in the vehicle, he looked around trying to figure out what to do. *Id.* It was during this time that the Defendant appeared to be nervous and trying to distance himself from the vehicle. *Id.* Recognizing this and because of the location of the traffic stop, TFA Pitts told him he could get a courtesy ride or do want he wanted. The Defendant then asked for the courtesy ride back to his work site. Contrary to the Defendant's assertions, TFA Pitts will testify that he advised the Defendant at that time, they would need to do a pat down search before he was allowed inside the officer's vehicle for the courtesy ride. This was told to the Defendant while he was still seated in his vehicle. The Defendant expressly stated "ok" to the pat down search. TFA Pitts then asked him if he had any weapons, and the Defendant stated he did not. It was after that exchange and in agreement to the conditions of the courtesy ride, that the Defendant got out of the vehicle. It is the United States position that the Defendant got out of the vehicle specifically so they could perform the pat down search. During this time, the Defendant had his cell phone with him and did not ask to make any calls or arrangements for a different ride. *Id*.

Officer Safranek with TFA Pitts present, conducted the voluntary pat down of Defendant's outer clothing and uncovered a folded knife located in Defendant's front pocket. *Id*. at 22. *See,* Attachment C at 9:57. Officer Safranek continued his pat down of Defendant's outer clothing and felt what he thought may be pills in Defendant's left cargo pants pocket. *Id*. Officer Safranek leaned over to convey this to TFA Pitts. *Id*. Upon overhearing this, Defendant stated that there were 2,000 pills in his cargo pocket. *Id*. At approximately 10:27 into the video, you can see Ofc. Safranek turn his head toward TFA Pitts and advise of what he felt. The Defendant is then seen speaking to TFA Pitts, consistent with the reports and testimony as to when he advised of the pills in his pocket. *Id.*

As a result of this voluntary statement, Defendant was placed under arrest and subsequently searched incident to arrest. ECF No. 1 at ¶ 23. This search found four plastic bags with light blue pills officers believed to be laced with fentanyl. *Id*. There is no basis for suppression and Defendant's motion should be denied.

## III.    DISCUSSION

A. THE OFFICER'S PAT DOWN FRISK OF DEFENDANT WAS LAWFUL.

   1. <u>*The Officers had a Reasonable and Articulable Basis to Conduct an Exterior Pat Down of the Defendant for Officer Safety*</u>

If a law enforcement officer concludes, in light of his training and experience, that the person may be "presently armed and dangerous," that officer is "entitled for the protection of himself and others in the area to conduct a carefully limited search of

the outer clothing" to discover weapons. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  To

justify a pat-down, "the police must harbor reasonable suspicion that the person

subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323,

327 (2009).

To establish reasonable suspicion a suspect is armed and dangerous, thereby

justifying a frisk, "the police officer must be able to point to specific and articulable

facts which, taken together with rational inferences from those facts, reasonably

warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. A "mere 'inchoate and

unparticularized suspicion or hunch' " that a person is armed and dangerous does not

establish reasonable suspicion, *Maryland v. Buie*, 494 U.S. 325, 332, 110 S.Ct. 1093,

108 L.Ed.2d 276 (1990) (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868) (some internal

quotation marks omitted), and circumstances suggesting only that a suspect would be

dangerous if armed are insufficient, see *United States v. Flatter*, 456 F.3d 1154, 1157

(9th Cir.2006). There must be adequate reason to believe the suspect is armed. *See id.*

As the Ninth Circuit analyzed in *Thomas v. Dillard*, 818 F.3d 864, 876–77 (9th

Cir. 2016),

> Reasonable suspicion is an objective standard, asking whether "a reasonably
> prudent [person] would have been warranted in believing [the suspect] was
> armed and thus presented a threat to the officer's safety while he was
> investigating his suspicious behavior." *Terry*, 392 U.S. at 28, 88 S.Ct. 1868.
> This inquiry requires consideration of all the facts and circumstances an officer
> confronts in the encounter; we consider the totality of the circumstances. *See
> id.*; *Navarette v. California*, —— U.S. ——, 134 S.Ct. 1683, 1687, 188 L.Ed.2d
> 680 (2014); Arvizu, 534 U.S. at 273, 122 S.Ct. 744; *United States v. Sokolow*,
> 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); 877 *United States v.*

*Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir.2010).

In assessing the totality of the circumstances, relevant considerations may include: observing a visible bulge in a person's clothing that could indicate the presence of a weapon, see *Flatter*, 456 F.3d at 1157 (citations omitted); seeing a weapon in an area the suspect controls, such as a car, see *Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); "sudden movements" suggesting a potential assault or "attempts to reach for an object that was not immediately visible," *Flatter*, 456 F.3d at 1157 (citing *United States v. Flippin*, 924 F.2d 163, 164–66 (9th Cir.1991)); cf. *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding reasonable suspicion was lacking where an individual's hands were empty and he made "no gestures or other actions indicative of an intent to commit an assault"); "evasive and deceptive responses" to an officer's questions about what an individual was up to, *Burkett*, 612 F.3d at 1107; unnatural hand postures that suggest an effort to conceal a firearm, *see id.* (suspect opened the passenger car door with his left hand and kept his right hand next to his body and appeared to reach for his coat pocket); and whether the officer observes anything during an encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed, see *Terry*, 392 U.S. at 28, 88 S.Ct. 1868; *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1086 (9th Cir.2000).

Thus, the type of crime a person is suspected of committing may be highly relevant to the existence of reasonable suspicion for a weapons frisk. *Id*. at 878. The Ninth Circuit has held that "it is reasonable for an officer to assume a suspected narcotics trafficker is likely armed." *Id*. (citing *United States v. $109,179 in United States Currency*, 228 F.3d 1080 (9th Cir. 2000)). The scope of the frisk must be confined to an "intrusion reasonable to discover guns, knives, clubs, or other hidden instruments." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

In the instant case, Defendant's behavior and the totality of the circumstances would lead to reasonable suspicion that he may be armed and dangerous, justifying a *Terry* frisk for weapons.  A search warrant for the vehicle Defendant was operating was granted on the basis that it was believed to be utilized in a drug trafficking operation.  ECF No. 1 at ¶ 6-7.  DEA agents conducted multiple controlled buys of large quantities of methamphetamine and fentanyl laced pills from suspects involved in the DTO.  ECF No. 1 at ¶ 6, *See also* Attachment A.  The DTO utilized several vehicles, residences, and a business to traffic narcotics to include the vehicle the Defendant was driving. *Id.*  The Defendant himself was suspected to be on of the "Joel's" previously identified as member of this DTO. Task Force agents and police officers had surveilled the car throughout the day on July 21, 2021 and had observed it located at 3829 Kennewick Ave., Kennewick, WA (Affordable Landscaping), a location where just days before, agents had seized numerous assault rifles and other drug trafficking evidence. *See*, Attachment A and B.  Moreover, TFA Pitts knew this vehicle, several suspects and large shipment of narcotics had been outstanding since the execution of the search warrants.

In addition to the above facts, at the time of the traffic stop, the Defendant gave evasive answers regarding his cell phone and was noted to be nervous and "want[ed] to distance himself from the situation and/or vehicle."  ECF No. 1 at ¶ 20.  All this information combined provided a reasonable and articulable basis to conduct a pat down search of the Defendant once he was removed from the vehicle.

*Re drug activity: In $109,179 in United Currency*, the Ninth Circuit noted that the factors giving officers reasonable suspicion to believe the suspect was armed and dangerous included knocking on the door of a room where officers knew a drug deal was taking place, questioning of the suspect failed to dispel officer's suspicion he was armed and dangerous, and the suspect's close proximity to the officer in a "small room." *United States v. I.E.V.*, 705 F.3d 430, 436 (9th Cir. 2012) (citing *United States v. $109,179 in United States Currency*, 228 F.3d 1080 (9th Cir. 2000)). These circumstances are analogous to those of Defendant. Defendant had been observed in a vehicle known to be involved with a DTO and had been observed at residence and business associated with that DTO. In agreeing to the officers' offer of a ride, Defendant would have been in a space even smaller than the "small room" in *$109,179 in United States Currency* and in much closer proximity to the officers, therefore posing a larger risk to officer safety.

The frisk was properly confined to discover weapons. The officer felt a bulge in an exterior pocket on Defendant's cargo pants. ECF No. 1 at ¶ 22. This frisk included only the Defendant's outer clothing, where he could have easily reached a weapon that could have been used to injure officers. In fact, during the frisk, a weapon was located which further supported the continued frisk of the Defendant. Officer Safranek, who conducted the frisk, merely mentioned to TFA Pitts that "based upon the exterior pat down of [Defendant], he believed there to be a large amount of pills in the cargo pocket." ECF No. 1 at ¶ 22. Defendant overheard this statement and

subsequently volunteered to the officers that he had 2,000 pills in his pocket. *Id*. As a result of this statement, Defendant was placed into custody and a search incident to arrest uncovered four plastic bags of light blue pills suspected to be laced with fentanyl. ECF No. 1 at ¶ 23.

Thus, based on this same vehicle's involvement in a drug trafficking investigation, its presence at a search warrant location where multiple firearms and other evidence had just been seized, the Defendant's own suspected involvement in that DTO and the Defendant's actions while interacting with the officers, there was more than sufficient basis to conduct a *Terry* frisk for weapons. Unlike the facts in the *Thomas* decision, at no time was the Defendant threatened at gun or taser point. The contact was cordial and voluntary, and the DEA agents present had specific and articulated facts to support the pat down search. As a result, the frisk was justified and was properly limited in scope.

2. <u>*Defendant's acceptance of a ride from officers on the condition that he be subjected to a frisk for weapons constituted voluntary consent to the frisk.*</u>

Even if this Court were to find that the officers did not have reasonable suspicion to frisk Defendant for weapons, the Defendant voluntarily consented to the frisk when he accepted the officers' offer of a ride. The Defendant expressly agreed to the condition that they frisk him for weapons prior to entering the patrol vehicle. Contrary to the Defendant's assertions, this consent was not the subject of coercion as the Defendant was given the choice as to whether he wanted a courtesy ride. In

possession of his cell phone and with access to other options than the courtesy ride, the Defendant chose to accept the ride and voluntarily consented to the pat down search.

Consent is a well-established exception to the warrant requirement under the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946)). "Consent searches are part of the standard investigatory techniques of law enforcement agencies" and are "a constitutionally permissible and wholly legitimate aspect of effective police activity." *Fernandez v. California*, 571 U.S. 292, 298 (2014) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). It is necessary that consent to a search be voluntary. Voluntariness is a question of fact to be determined from the totality of the circumstances. *Id.* at 248-49.

The Ninth Circuit has identified five factors to be considered in determining the voluntariness of consent to a search:

> (1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether Miranda warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained. The fact that some of these factors are not established does not automatically mean that consent was not voluntary.

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012), citing *United States v. Morning*, 64 F.3d 531, 533 (9th Cir.1995) (quoting *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988)).

In finding that *Russell* consented to the pat down search the Ninth Circuit concluded,

> Russell was not in custody when the search occurred, nor did the officers have their guns drawn, or even visible at any point during the encounter with Russell. The third factor, Miranda warnings, does not bear on this case because Russell was not under arrest at the time of the searches and once he was arrested, the warnings were provided. "It would ... make little sense to require that Miranda warnings ... be given by police before requesting consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 (9th Cir.2010) (quoting *United States v. Ritter,* 752 F.2d 435, 438 (9th Cir.1985)).
> The fourth factor is either neutral or slightly favors Russell: he was not told that he could refuse to consent. However, the district court found that the officers told Russell he was free to leave, which is an instructive, but certainly less clear, way of saying that consent could be refused. In any event, consent to a search is not necessarily involuntary simply because officers failed to provide notice of the right to refuse. *United States v. Cormier*, 220 F.3d 1103, 1113 (9th Cir.2000). Finally, the officers did not tell Russell that they could obtain a search warrant if he refused to consent. The district court's finding that Russell affirmatively consented to the search, coupled with consideration of this five-part inquiry, supports the district court's conclusion that the consent was free and voluntary. There was no error, let alone clear error, in this determination.

664 F.3d at 128.

In the instant case, the totality of the circumstances establishes the voluntary nature of the Defendant's consent. During the entire contact with the Defendant, there were no weapons drawn. At the time of the traffic stop, only one uniformed officer approached the Defendant. The Defendant provided his identification and during their contact, also provided his number when asked. The Defendant was in fact, seen using his phone during the traffic stop. The Defendant willingly handed the officer his cell phone so the officer could assist him in locating the number. See, *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (routine request for

identification "does not, by itself, constitute a Fourth Amendment seizure" and the fact that "most citizens will respond to a police request," and "do so without being told they are free not to respond, hardly eliminates the consensual nature of the response"). The cell phone was given directly back to the Defendant. The Defendant possessed this cell phone during the entirety of the interaction. The Defendant was allowed to remain inside the vehicle. When the DEA agents arrived, they were in plain clothes and did not display their weapons.

Once the DEA agents had arrived, TFA Pitts contacted the Defendant at the driver's side window. Again, no guns were drawn and TFA Pitts was in plain clothes. The Defendant at that time was advised of the existence of the warrant. TFA Pitts asked the Defendant if he would agree to be interviewed about the drug investigation. When asked if he wished to engage in an interview back at the police station with TFA Pitts, the Defendant declined, evidencing the non-coercive environment surrounding the traffic stop. ECF No. 1 at ¶ 20. The Defendant was also made aware of the drug investigation before he consented to the pat down search.

Given that Defendant no longer had a vehicle, officers offered to give him a courtesy ride to where he needed to go or whatever else the Defendant wanted to do. ECF No. 1 at ¶ 21. The Defendant again, in possession of his cell phone, did not ask to make a call; did not ask to have someone pick him up. Instead, the Defendant accepted the offer of a courtesy ride. *Id.* The Defendant requested that the officers drive him back to the construction site he had left from. *Id.* TFA Pitts informed

Defendant that he would need to be searched for weapons before officers could transport him. ECF No. 1 at ¶ 21. The United States disputes the Defendant's claims that he was not asked to consent to the pat down search and that they were already patting him down when he was advised of the need to do so before the courtesy ride. However, the circumstances of the contact up to that point and the Defendant's actions further belie his proposed testimony. Whether he was advised of the need for a pat down or expressly asked if he would agree, when he voluntarily exited the vehicle after asking for the courtesy ride, he knew he was not under arrest and did not have to go with them. Having already evidenced his free will be declining an interview, the Defendant was free to ask them to stop at any time. If he did not understand why they were frisking him, he could have stopped to ask. He did not. The Defendant accepted both the officers' offer of a ride and the condition that he would need to be searched for weapons if he chose to accept that ride. As a result, Defendant voluntarily consented to the frisk for weapons.

Given these facts, it is simply not accurate to state the Defendant had no way of avoiding the search as the Defendant argues. *See*, ECF 51 at 9. The Defendant asserts this was a "bait and switch" and compares the agent to that of a used car salesman. *Id.* Upon review of the video and the reports, there is simply no basis to impugn TFA Pitts in that manner. This was a serious investigation into a substantial DTO. *See*, Attachments A and B. TFA Pitts had rightfully obtained a federal search warrant for this vehicle, a vehicle that was not observed for several days after the

execution of search warrants.  The execution of warrants that were well known to this

DTO by the time of this traffic stop.  Therefore, there were several factors to consider

in addition to officer safety in contacting this vehicle.

Throughout the video, the intention of the agents was to "kick him loose" and to

offer him a courtesy ride.  The Defendant was informed that he was not under arrest

on several occasions and therefore free to leave the officers' presence at any time.

Circumstances also allowed Defendant multiple other options to leave the area

without agreeing to a ride from the officers, which required him to be frisked for

weapons.  Defendant was stopped at approximately 5:30pm, during daylight hours.

ECF No. 1 at ¶ 18.  The stop occurred at the intersection of West 12 and Highway

397, an area surrounding with multiple businesses open to the public where Defendant

could have sought help returning to the construction site if he had desired.  *Id*.

Defendant also retained possession of his phone, which he could have used to call for

assistance from someone other than the officers.  ECF No. 1 at ¶ 19; See also *United

States v. Brown,* 996 F.3d 998, 1005-1006 (9th Cir, 2021).

Even where a defendant was in the desert after dark four miles from the nearest

highway and thirteen miles from the city where he wanted to go, the Ninth Circuit still

determined the defendant "voluntarily agreed to join the officers" in their vehicle.

*United States v. Carillo*, 902 F.2d 1405, 1411 (9th Cir. 1990).  Here, Defendant was

explicitly informed that he was not under arrest and had other avenues available to

leave the site of the stop.  However, he chose to accept the offer of a ride from law

enforcement and agreed to the condition that he be subjected to a frisk for weapons prior to that ride.  The Defendant expressly consented to the exterior pat down frisk and further volunteered that he had pills in his pocket.

3.  *The Defendant's voluntary statement the items felt by the officer, were 2000 pills provided sufficient probable cause to conduct a full search of his pockets.*

Once the presence of the drugs became known in this manner, they could be seized without the Defendant's consent pursuant to a tactile variation on the "plain-view" rule. *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); See also, *United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir.  2000); *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (finding contraband seized incident to a lawful *Terry* search is admissible).  Moreover, where a Defendant is arrested based upon probable cause, officers may conduct a search of a defendant's person without a warrant and evidence obtained as the result of such a search should not be excluded.  *United States v. Robinson*, 414 U.S. 218 (1973).

As stated above, the pills found in Defendant's pocket were not discovered as the result of the officer's frisk of Defendant for weapons.  The pills were only discovered after Defendant volunteered to officers that he had 2,000 pills in his pocket.  ECF No. 1 at ¶ 23.  As a result of this statement, officers obtained probable cause to arrest Defendant and placed him into custody.  *Id*.  Moreover, they were justified in removing the pills from his pocket based upon his statement.  This arrest further allowed officers to conduct a full search of Defendant, during which they

found the pills in his pocket. *Id.* This search was well within an exception to the warrant requirement and as a result does not require that the evidence obtained during the search be excluded.

## IV.   CONCLUSION

For the above reasons, the United States respectfully submits there is no basis to suppress the evidence and Defendant's motion should be denied.

### CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the counsel of record, Adam R. Pechtel.

_s/_
Stephanie Van Marter
Assistant United States Attorney